# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| WHEELING & LAKE ERIE RAILWAY CO., | ) ) ) |
| Appellant, | ) ) |
| v. | ) 1:18-cv-00262-JDL ) |
| ROBERT J. KEACH, in his capacity as the Estate Representative for MONTREAL MAINE & ATLANTIC RAILWAY, LTD., | ) ) ) ) ) |
| Appellee. | ) |

## ORDER ON MOTION FOR STAY AND INJUNCTIVE RELIEF PENDING APPEAL

This bankruptcy appeal concerns a secured claim made in connection with the 2013 Lac-Mégantic train derailment tragedy. Appellant Wheeling & Lake Erie Railway Co. ("Wheeling") moves under Rule 8007(b) of the Federal Rules of Bankruptcy Procedure to stay the judgment of the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Judgment") dated June 22, 2018. To implement the stay, Wheeling also seeks an injunction requiring Appellee Robert J. Keach, the post-confirmation Estate Representative of Montreal Maine & Atlantic Railway Ltd. (the "Estate Representative" of "MMA"), to ensure that the Debtor's Estate contains sufficient funds to pay Wheeling's claim if Wheeling prevails on appeal. For the reasons that follow, I deny the motion.

## II. BACKGROUND

On July 6, 2013, MMA's freight Train 282, which was transporting crude oil, derailed in Lac-Mégantic, Quebec, Canada, killing 48 people and causing catastrophic damage to the town. MMA subsequently filed for bankruptcy in the District of Maine—as well as in Canadian courts—because of the losses and liabilities arising from the derailment. After filing for bankruptcy, the Estate Representative (then serving as the Estate Trustee) commenced litigation against various parties, including the shipper of the crude oil, Western Petroleum Company, together with its corporate affiliates World Fuel Services Corporation and World Fuel Services, Inc. (collectively, the "Shipper"), for their respective roles in causing the disaster. In 2015, the Estate Representative entered into a global settlement with the Shipper, whereby the Shipper agreed to contribute 110 million dollars to a settlement fund in exchange for the release of all claims against it arising from the Lac-Mégantic derailment. Wheeling subsequently initiated this litigation seeking, in relevant part, a declaratory judgment that it held a valid, perfected, and enforceable security interest in MMA's contractual and/or statutory and regulatory claims against the Shipper that were released as part of the settlement.

In 2015, the Bankruptcy Court entered an order confirming the Trustee's "Revised First Amended Plan of Liquidation" (the "Confirmation Plan"). Paragraph 84 of the Confirmation Plan—which was added to resolve Wheeling's objection to the plan—required the Estate Representative to set aside $5,032,134.12 (the "Set-Aside Fund") "pending further order of the Bankruptcy Court" to secure payment to

Wheeling if Wheeling was later found to be entitled to payment on its security interest.

On June 22, 2018, the Bankruptcy Court issued an oral decision ruling that MMA had no contractual, statutory, or regulatory claims against the Shipper to which Wheeling's security interest attached, and even if such claims existed, Wheeling had failed to establish that they had any net value. Immediately after the decision was announced, counsel for Wheeling made an oral motion to stay, which the court denied. Later that day, the Estate Representative released the money in the Set-Aside Fund to the Canadian Monitor (essentially the Estate Representative's Canadian counterpart in the parallel Canadian bankruptcy proceedings) in keeping with the Confirmation Plan. There is no evidence before me as to whether the money in the Set-Aside Fund has been disbursed by or remains with the Canadian Monitor. Wheeling's appeal from the Bankruptcy Order to this Court is taken pursuant to 28 U.S.C. § 158 (2012) and Rule 8003 of the Federal Rules of Bankruptcy Procedure.

### III. LEGAL ANALYSIS

In ruling on a motion for stay pending appeal under Fed. R. Bankr. P. 8007, the Court must consider: "(1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the stay will injure other parties (*i.e.* balance of the hardships); and (4) where the public interest lies." *Rivera v. Lake Berkley Resort Master Ass'n (In re Otero Rivera)*, 532 B.R. 425, 426 (Bankr. D.P.R. 2015) (citing *Acevedo–García v. Vera–Monroig*, 296 F.3d 13, 16 n.3 (1st Cir. 2002)); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). "The

*sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (emphasis added).

I consider Wheeling's motion for stay relative to the required four-part inquiry, focusing primarily on the likelihood of success on the merits, "the touchstone of the preliminary injunction inquiry." *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998) (internal quotation marks omitted)).

## A. Likelihood of Success on the Merits

Wheeling argues that the Bankruptcy Court made two critical errors that give it a reasonable likelihood of appellate success: first, the court misinterpreted federal rail transportation law in concluding that MMA, one of several rail carriers transporting the crude oil, has no contractual, statutory, or regulatory claims against the shipper of the crude oil; and second, the court relied on improper lay and expert opinion testimony to find that even if MMA had contractual, statutory, or regulatory claims, those claims have no value. I conclude that Wheeling has failed to demonstrate that it is likely that the Bankruptcy Court erred in finding that any potential claims have no value. Accordingly, I limit my analysis to the valuation question and I will not attempt to unravel the thicket of federal rail transportation law associated with the first alleged error at this time.

The Bankruptcy Court gave two reasons for its conclusion that any potential non-tort claims by MMA against the Shipper have no value: first, Wheeling, as the

4

party with the burden of proof, failed to introduce evidence establishing the reasonable settlement value of MMA's claims; and second, Wheeling did not rebut the Estate Representative's testimony that the claims have no value. ECF No. 7 at 22. Although Wheeling contends that the Bankruptcy Court erred in considering the Estate Representative's testimony, which Wheeling asserts was improper expert testimony, the Bankruptcy Court's first rationale for determining that the claims have no value is not dependent on that testimony.

It was Wheeling's burden, as the secured party, to identify the value of the proceeds of its collateral. *See Gen. Elec. Co. Bus. Lighting Grp. v. Halmar Distribs., Inc. (In re Halmar Distributors, Inc.)*, 232 B.R. 18, 24 (Bankr. D. Mass. 1999) ("[The secured party] has the burden of identifying the proceeds from the sale of its collateral."); UCC § 9-315(a)(2) (Am. Law Inst. & Unif. Law Comm'n 2017) ("[A] security interest attaches to any identifiable proceeds of collateral."). Here, the collateral is MMA's contractual, statutory, and regulatory claims against the Shipper. The "proceeds" of the collateral is "whatever is acquired upon the sale, lease, license, exchange, or other disposition of the collateral . . . ." UCC § 9-102(a)(64)(A).

Wheeling cites to a written stipulation between the parties as evidence of the value of its collateral. That stipulation, in relevant part, reads:

> Assuming (without admitting) that such claims existed, the Estate Representative would have incurred legal fees and costs in an amount no less than $825,000 but not greater than an amount that would cause the net economic damages referred to above [$25,000,000], after deducting legal fees and costs, to be less than $10,000,000, had he pursued civil breach of contract claims directly against the [Shipper] . . . including attorneys' fees, litigation costs, expert fees, and the cost of defending against any and all counterclaims.

5

Wheeling views the stipulation as sufficient to prove the value of the proceeds of its collateral, arguing "[MMA] was (and remains) obligated to adequately protect Wheeling for the value of the collateral so used. That value, as stipulated and entered into the trial record, was no less than $10,000,000." ECF No. 26 at 3. However, the stipulation established the amount of MMA's "net economic damages" associated with the breach of contract claims, and not the value of MMA's breach of contract claims or, for that matter, any statutory or regulatory claims. Wheeling incorrectly treats these two measures as the same. But there are various factors that would reasonably cause parties bargaining in good faith to discount MMA's stipulated net economic damages in arriving at a reasonable settlement value for the claims, including the strength of the evidentiary support for the claims and the strength of likely defenses and counterclaims. Wheeling offered no evidence as to the realistic value of MMA's claims against the Shipper apart from the amount of the economic damages after deducting legal fees and costs. Given that Wheeling failed to produce evidence from which the Bankruptcy Court could decide the valuation issue, it is unlikely that Wheeling will succeed on its argument that the Bankruptcy Court erred by concluding that Wheeling failed to meets its burden of proving the value, if any, of the proceeds of its collateral.

It also appears at this early juncture that Wheeling will have difficulty succeeding on its argument that the Bankruptcy Court erred by receiving and considering the Estate Representative's testimony related to the valuation issue. First, the Estate Representative testified that the aggregate value of all claims for damages against the Shipper was at least 2.5 billion dollars, ECF No. 5 at 267, yet

6

all of those claims were settled for only 110 million dollars, or 4.4% of the total aggregate value, as part of the comprehensive settlement. Wheeling presented no evidence about what effect this precipitous settlement discount had on the value of MMA's claims. In addition, the Estate Representative testified that the Shipper asserted substantial counterclaims far in excess of MMA's claims, and that it was undisputed that MMA was not free from negligence. This testimony was not expert witness opinion testimony because it did not require specialized or expert knowledge and is properly considered fact testimony. *See id.* at 239-41. In addition, Wheeling offered no evidence assessing how MMA's contributory negligence or the Shipper's probable counterclaims affected the value of MMA's potential claims.

Even if, as Wheeling argues, other portions of the Estate Representative's testimony were improper opinion testimony, that alone would not be reversible error because the non-opinion testimony provided by the Estate Representative supported the Bankruptcy Court's conclusion that Wheeling had failed to demonstrate the value of the proceeds of the claims.

For the foregoing reasons, Wheeling has not shown a likelihood of success on the valuation issue and, therefore, on the merits.

**B.      The Remaining Injunction Factors**

"[T]he four factors [in the preliminary injunction standard] are not entitled to equal weight in the decisional calculus; rather, '[l]ikelihood of success is the main bearing wall of the four-factor framework.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9-10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). Here, the last three factors—irreparable harm, balance of the

7

hardships, and the public interest—either weigh against the issuance of a stay and an injunction, or are neutral. Wheeling has not established that it will suffer irreparable harm absent relief. As Wheeling itself notes, the possibility remains that it may be able to satisfy its secured claim by recovering from assets other than the Set-Aside Fund. ECF No. 15 at 25. The balance of the hardships is a neutral factor because although Wheeling may be required to undertake burdensome steps to recover its collateral value if the money in the Set-Aside Fund is beyond its reach, the same would likely be required of the Estate Representative if he were required to attempt to claw back the released funds from the Canadian bankruptcy Monitor and claimants in that foreign proceeding. Finally, the public interest weighs against injunctive relief and weighs in favor of the timely payment of claims to the victims of the Lac-Mégantic train derailment that occurred over five years ago.

## III. CONCLUSION

For the foregoing reasons, Wheeling & Lake Erie Railway Co.'s Motion for Stay and Injunctive Relief Pending Appeal (ECF No. 15) is **DENIED**.

**SO ORDERED.**

**Dated this 1st day of October, 2018.**

                                                    /s/ JON D. LEVY
                                                  **U.S. DISTRICT JUDGE**