## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **WHEELING & LAKE ERIE** | ) | |
| **RAILWAY CO.,** | ) | |
| | ) | |
| **Appellant,** | ) | |
| | ) | |
| v. | ) | 1:18-cv-00262-JDL |
| | ) | |
| **ROBERT J. KEACH,** solely in his | ) | |
| capacity as the Estate Representative | ) | |
| for **MONTREAL MAINE &** | ) | |
| **ATLANTIC RAILWAY, LTD.,** | ) | |
| | ) | |
| **Appellee.** | ) | |

## ORDER ON BANKRUPTCY APPEAL

Wheeling & Lake Erie Railway Co. ("Wheeling") appeals from the Bankruptcy Court's judgment in favor of the Estate Representative for Montreal Maine & Atlantic Railway Ltd. (the "Estate Representative" for "MMA"). For the reasons that follow, I **AFFIRM** the judgment.

## I. BACKGROUND

This case arises out of the derailment of Train 282 in Lac-Mégantic, Canada, on July 6, 2013. Four years before the derailment, Wheeling extended a line of credit to MMA in the amount of $6,000,000, which was secured by a valid, perfected, and enforceable security interest. Wheeling's security interest encumbered all contractual and statutory payment rights, i.e., all non-tort payment rights.

On June 29, 2013, Western Petroleum Company and its corporate affiliates, World Fuel Services Corporation and World Fuel Services, Inc. (collectively, the "Shipper"), arranged to ship crude oil by rail with Canadian Pacific Railway Company

(together with its American operating affiliate Soo Line Railroad Company, "CP") and MMA from New Town, North Dakota, to Saint John, New Brunswick in Canada. The crude oil was to be transported in 72 tank cars ("Train 282") originating in North Dakota on the Soo Line, transferring to CP in Windsor, Ontario, connecting to MMA's lines in Quebec, and finally transferring to the New Brunswick Southern Railway for travel to its ultimate destination. In the chain of transportation, CP was the originating carrier and MMA was a connecting carrier.

The transport of Train 282 was governed by a bill of lading (the "BOL"), which was created by the Shipper logging onto CP's online bill of lading system, filling in the required information, and electronically signing. The BOL contained a section titled "Route" where the Shipper listed both "CPRS" (referring to CP and Soo Line) and "MMA." This is the only place in the BOL in which MMA is identified. The BOL was a "through" bill of lading, which is one that specifies multiple carriers moving cargo from the origination point to the final destination in a single document. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 93-94 (2010).

On July 6, 2013, Train 282 derailed and exploded in the town of Lac-Mégantic, causing catastrophic damage to the town and claiming 47 lives. Testing later revealed that the crude oil it was transporting had a dangerously low flash point and high volatility. Although the crude oil should have been labeled as a Packing Group I or II hazardous substance, indicating that it was a more dangerous and explosive crude oil, the Shipper instead labeled it as Packing Group III, the least hazardous category of crude oil.

As a result of the loss of life, the property damage, and the damage to MMA's assets and business caused by the derailment, MMA filed a Chapter 11 bankruptcy petition on August 6, 2013, in the United States Bankruptcy Court for the District of Maine. MMA also filed an affiliated insolvency proceeding in the Superior Court for the Province of Quebec, Canada.

In the U.S. bankruptcy case, the Estate Representative for MMA sued the Shipper, asserting that the Shipper's mislabeling of the crude oil on Train 282 caused MMA to fail to take certain precautions which led to the derailment, and that the Shipper was liable for the damage caused to MMA and others by the derailment. The Estate Representative alleged that the derailment led to numerous litigation claims caused by the Shipper, with damages estimated "in the hundreds of millions of dollars, and potentially in excess of a billion dollars." ECF No. 31 at 24. Wheeling and the Estate Representative have stipulated in this proceeding that the net economic damage suffered specifically by MMA in the derailment was at least $10,000,000. That stipulation, which is at the heart of the issues presented, reads, in relevant part:

1. The derailment of the freight train carrying crude oil on July 6, 2013, in Lac-Mégantic, Quebec (the "Derailment") caused MMA to suffer economic damages as a result of the loss in value of its business, and other economic damages, in an amount no less than $25,000,000.

2. Assuming (without admitting) that such claims existed, the Estate Representative would have incurred legal fees and costs in an amount no less than $825,000 but not greater than an amount that would cause the net economic damages referred to above, after deducting legal fees and costs, to be less than $10,000,000, had he pursued civil breach of contract claims directly against the shipper of the crude oil transported on the freight train involved in the

Derailment, including attorneys' fees, litigation costs, expert fees, and the cost of defending against any and all counterclaims.

ECF No. 31 at 24-25.

The Estate Representative, the Shipper, and other parties with claims arising from the derailment agreed to settle the claims against the Shipper and memorialized that agreement in a Plan Support and Settlement Agreement (the "Comprehensive Settlement"). Under the Comprehensive Settlement, the Estate Representative agreed to release all claims that MMA had against the Shipper. In addition to the Estate Representative's release of MMA's claims, the Comprehensive Settlement also contemplated that all of the other parties would also release their claims against the Shipper. In exchange for the Estate Representative's release of MMA's claims and similar releases from all other parties, the Shipper agreed to pay a total of $110,000,000. In addition, the Shipper agreed to release any and all counterclaims that it might have had against MMA. The settlement proceeds were to be paid by the Shipper to the Monitor in the Canadian bankruptcy case, who agreed to distribute them to third parties who may hold derailment claims against MMA.

When the Estate Representative sought confirmation of the Comprehensive Settlement, Wheeling objected, arguing that the claims released by the Estate Representative under the Comprehensive Settlement were Wheeling's collateral and, as such, Wheeling was entitled to "adequate protection," pursuant to 11 U.S.C.A. § 363(e) (West 2019), before its collateral could be released as part of the settlement. The Bankruptcy Court confirmed the Comprehensive Settlement while preserving Wheeling's rights to adequate protection.

After confirming the Comprehensive Settlement, the Bankruptcy Court held a bench trial to determine the nature and value of MMA's claims against the Shipper. At the conclusion of the trial, the court ruled in favor of the Estate Representative and against Wheeling, concluding that: (1) MMA's derailment claims against the Shipper that were released and discharged were not contract, statutory or regulatory claims and therefore were not Wheeling's collateral; and (2) even if the claims were Wheeling's collateral, Wheeling had failed to prove that the collateral had any "net value." Wheeling appeals from that decision.

For reasons I will explain, I conclude that the Bankruptcy Court erred in determining that MMA did not have regulatory and contractual claims against the Shipper that constituted Wheeling's collateral, but I also conclude that the Bankruptcy Court did not err in finding that the collateral had no value. To prevail on its appeal, Wheeling must show error on both issues. Accordingly, I affirm the judgment in favor of the Estate Representative.

## II. LEGAL STANDARD

Federal district courts have jurisdiction over appeals from final judgments, orders, and decrees of the bankruptcy courts. 28 U.S.C.A. § 158(a)(1) (West 2019). "On intermediate appeal to a district court, a final order of the bankruptcy court is subject to the same familiar standards of review normally employed in direct appeals to the courts of appeals in civil cases generally." *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir. 1992). The district court reviews the bankruptcy court's conclusions of law *de novo* and any factual findings under the more deferential clearly erroneous

standard. *See Tamir v. United States Tr.*, 566 B.R. 278, 281 (D. Me. 2016); *Davis v. Cox*, 356 F.3d 76, 82 (1st Cir. 2004).

## III. ANALYSIS

This appeal raises two central issues: (A) Did MMA have contractual and regulatory claims, as opposed to tort claims, arising from the derailment of Train 282 that constituted Wheeling's collateral; and (B) if MMA did have such claims, did Wheeling meet its burden to prove that those claims had value? The Bankruptcy Court ruled that no claims existed and that even if any such claims did exist, Wheeling had failed to prove their value. *See* ECF No. 7 at 19-24. Thus, the court concluded that Wheeling was not entitled to compensation for the Estate Representative's release of MMA's claims against the Shipper as part of the Comprehensive Settlement. *Id.* at 23-24. I address each issue in turn.

### A.    The Existence of Wheeling's Collateral

The parties do not dispute that the Shipper mislabeled the crude oil carried by Train 282. The BOL, which the Shipper created, identified the oil as Packing Group III, the least hazardous category of crude oil. But post-derailment tests showed that the crude oil had a dangerously low flash point and was highly volatile, and therefore should have been labeled as a Packing Group I or II hazardous substance— classifications indicating a more dangerous, volatile, and explosive cargo. Wheeling argues that this mislabeling of the oil provided MMA with both regulatory and contractual claims for damages against the Shipper that were released by the Comprehensive Settlement entered into by the Estate Representative.

According to Wheeling, MMA's alleged regulatory claims arise from an indemnification provision in the Uniform Bill of Lading ("Uniform BOL," *see* 49 C.F.R. § Pt. 1035, App. A, B (West 2019)). Specifically, Wheeling contends that the Shipper's duty to indemnify arose because the Shipper failed to disclose that the crude oil to be transported was dangerous or explosive. The indemnification provision of the Uniform BOL states:

> Every party, whether principal or agent, shipping explosives or dangerous goods, without previous full written disclosure to the carrier of their nature, shall be liable for and indemnify the carrier against all loss or damage caused by such goods, and such goods may be warehoused at owner's risk and expense or destroyed without compensation.

49 C.F.R. § Pt. 1035, App. B, Sec. 6. By mislabeling the crude oil, Wheeling contends, the Shipper failed to provide "full written disclosure" of the cargo's nature and therefore was obligated to indemnify MMA against the loss resulting from the derailment.

Wheeling also contends that MMA had contractual claims arising from an indemnification provision in CP's tariffs, which, Wheeling argues, the Shipper agreed to when it signed the BOL. For example, Item 20 of CP's Tariff 6 required the Shipper to:

> fully indemnify, defend and hold harmless CP from all losses, including, without limitation, attorneys' fees and other costs of litigation, damage, injury, death or any other liability . . . to the extent such losses are caused by or otherwise arise from . . . Shipper's failure to comply with the terms and conditions of this Tariff.

CP Tariff 6, Item 20 (Plaintiff's Exhibit 13). Tariff 6 further required the Shipper to comply with the terms of all other CP tariffs and applicable laws, *see id.* ("At all times when Private Equipment owned, leased or provided by, or on behalf of, Shipper are

used on CP, Shipper shall be responsible for ensuring that the Private Equipment

. . . comply with all applicable tariffs."), which included provisions requiring proper

labeling of crude oil for shipment. *See* CP Tariff 8, Item 20 (Plaintiff's Exhibit 15)

("Shippers are responsible for product classification and selection of packaging in

accordance with legal requirements."); *id.*, Item 21 ("Hazardous Commodities shall

be properly marked, labelled and placarded by Customer as required by the

Dangerous Goods Laws."). In addition to accepting CP's terms and conditions, the

Shipper further made the following contractual representation when it generated and

agreed to the BOL:

> [T]he contents of this consignment are fully and accurately described by
> proper shipping name(s) and are classified, packaged, marked and
> labeled/placarded, and are in all respects in proper condition for
> transport according to international and national government
> regulations.

ECF No. 31 at 19.

MMA's conditions of carriage, meanwhile, incorporated the conditions of

carriage of the originating carrier, CP:

> When MMA is not the originating carrier, but does participate in a
> movement under single factor or joint through rates, the Conditions of
> Carriage or comparable offering of the originating carrier shall . . . apply
> to such transportation performed by MMA . . . .

MMA Conditions of Carriage at 5, Rule 120(3) (Plaintiff's Exhibit 66). Thus, because

MMA's conditions of carriage incorporated CP's terms and conditions (including its

tariffs) while the cargo was on MMA's lines, and because the Shipper violated CP's

terms and conditions by mislabeling the crude oil, thereby triggering indemnification,

Wheeling argues that MMA was entitled to indemnification from the Shipper.

The parties dispute, however, whether MMA could have availed itself of the indemnification provisions of either the Uniform BOL or the BOL. Wheeling argues that MMA was entitled to indemnification for two independent reasons: first, because federal law imposes the terms of the Uniform BOL on all rail common carriers regardless of the contractual terms the parties enter into themselves; and second, because MMA was a party to the BOL and could enforce both the terms of that contract (i.e., CP's indemnification provisions) and the terms of the Uniform BOL, which the BOL incorporated by reference. I address both arguments in order and conclude that MMA was entitled to indemnification under the terms of both the Uniform BOL and the BOL, thereby providing Wheeling with collateral.

### 1. Uniform Bill of Lading

Wheeling argues that because MMA acted as a "common carrier" in moving Train 282, the movement of Train 282 was "transportation" by a "rail carrier" subject to the jurisdiction of the Surface Transportation Board ("STB"). *See* ECF No. 31 at 35. As a rail carrier, MMA was required to "issue a receipt or bill of lading for property it receive[d] for transportation" pursuant to 49 U.S.C.A § 11706(a) (West 2019) (the so-called "Carmack Amendment")[1], *see Kawasaki*, 561 U.S. at 97, and it was further "required to use straight bills of lading as prescribed in Appendix A and B" to Part 1035 of Title 49 of the Code of Federal Regulations. 49 C.F.R. § 1035.1(a).

---

[1] The Carmack Amendment, enacted as an amendment to the Interstate Commerce Act in 1906, created a national, uniform scheme of carrier liability. *See Rini v. United Van Lines, Inc.*, 104 F.3d 502, 504 (1st Cir. 1997) ("[T]he principal purpose of the [Carmack] Amendment was to achieve national uniformity in the liability assigned to carriers."). As a default, the Carmack Amendment imposes liability on any carrier for the actual loss or injury to the transported property, regardless of where the loss or injury occurs. *Kawasaki*, 561 U.S. at 98. In this way, the amendment "relieve[s] cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Id.* (internal quotation marks omitted).

Thus, Wheeling argues, for common carrier transportation, the terms of Appendices A and B to Part 1035, which contain the indemnification provision for mislabeled dangerous goods as previously described, are automatically incorporated into the BOL as a matter of federal law—whether or not they are stated expressly in the parties' contract. Moreover, Wheeling contends, the Uniform BOL applies by operation of federal law to all carriers, including connecting carriers like MMA.

The Estate Representative does not dispute that MMA acted as a "common carrier" in moving Train 282 and was therefore subject to the jurisdiction of the STB. Instead, the Estate Representative argues that: (1) the Bankruptcy Court correctly found that the Uniform BOL was not automatically incorporated into the BOL between the Shipper and CP by operation of federal law, *see* ECF No. 34 at 53; and (2) even if the Uniform BOL was incorporated into the BOL, MMA was not a party to that contract and cannot enforce its terms. *See id.* at 54 n.26.

As a preliminary matter, contracting shippers and carriers can avoid the jurisdiction of the STB and the associated regulatory requirements that invoke the Uniform BOL by entering into a private transportation contract under 49 U.S.C.A § 10709 (West 2019).[2] *See Babcock & Wilcox Co. v. Kans. City S. Ry. Co.*, 557 F.3d

---

[2] Section 10709 states, in relevant part:

> (a) One or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.

> (b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.

> (c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.

*(continued next page)*

134, 138 (3d Cir. 2009) ("[S]hippers and carriers [may] sidestep federal regulation of transportation agreements by entering into private contracts" that are governed by § 10709 and not subject to the Carmack Amendment). However, the parties here agree that the Shipper and CP made no such agreement, and that § 10709 is therefore inapplicable. *See* ECF No. 54 at 43:16-44:8; ECF No. 31 at 36.

Nonetheless, the Estate Representative contends that by adopting the BOL with terms different than the Uniform BOL, the Shipper and CP preempted any application of the Uniform BOL. *See* ECF No. 54 at 44:1-44:23. Thus, the Estate Representative argues, the Bankruptcy Court correctly held as a matter of both fact and law that the Uniform BOL was not automatically incorporated into the negotiated BOL. *See* ECF No. 7 at 23:7-23:14 (citing *Norpin Mfg. Co. v. CTS Con-Way Transp. Servs., Inc.*, 68 F. Supp. 2d 19, 24 (D. Mass. 1999)).

To support its argument, the Estate Representative relies primarily on *Norpin* and *Whatley v. Canadian Pac. Ry. Ltd.*, 904 F.3d 614 (8th Cir. 2018).[3] In both cases, the defendant carriers alleged that the plaintiff shippers'[4] claims arising from damaged cargo were untimely because they were filed outside of the limits imposed by the Carmack Amendment. *Whatley*, 904 F.3d at 617; *Norpin*, 68 F. Supp. 2d at 22. The Carmack Amendment provides in relevant part:

> A rail carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under

---

49 U.S.C.A. § 10709(a)-(c)(1).

[3] The Bankruptcy Court cited exclusively to *Norpin* in holding that the Uniform BOL was not automatically incorporated into the BOL. *See* ECF No. 7 at 23:7-23:14.

[4] In *Whatley*, the claims were brought by the trustee of a wrongful death claimant's trust as assignee for the shipper. 904 F.3d at 617. The claims also arose from the 2013 Lac-Mégantic tragedy. 904 F.3d at 616-17.

this section. The period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.

49 U.S.C.A. § 11706(e). The defendant carriers sought to enforce the statutory nine-month and/or two-year limitation periods despite those terms being absent from the parties' bills of lading. *Whatley*, 904 F.3d at 617; *Norpin*, 68 F. Supp. 2d at 22. In both cases, the courts held that the Uniform BOL's limitation periods for filing claims were not incorporated into the parties' bill of lading. *Norpin*, 68 F. Supp. 2d at 23-24; *Whatley*, 904 F.3d at 618-19.

*Norpin* is distinguishable from the circumstances presented here because it concerned motor carriers, not rail carriers, and motor carriers are not subject to the requirements of 49 C.F.R. § 1035.1, which apply to "[a]ll common carriers . . . *by rail or water*." 49 C.F.R. § 1035.1(a) (emphasis added); 68 F. Supp. 2d at 25 (applying 49 U.S.C.A. § 13710, which concerns motor carriers).

*Whatley* did concern rail carriers and the application of Part 1035. The court observed in *Whatley* that the parties' "generic" bill of lading did not contain language incorporating the Uniform BOL. 904 F.3d at 618-19. Although it can be implied from the decision that the Uniform BOL is not automatically incorporated into bills of lading, the majority opinion in *Whatley* did not expressly address the issue. The partial dissenting opinion in *Whatley* did address the issue, reasoning that "the uniform bill of lading is required by federal law" and that "[f]or shipments subject to the Carmack Amendment, rail carriers must use the uniform straight bill of lading prescribed by federal regulations [including Appendices A and B to pt. 1035]." *Whatley*, 904 F.3d at 622 (Gruender, J., concurring in part and dissenting in part).

The partial dissenting opinion in *Whatley* is persuasive because the regulatory scheme, by its plain language and structure, mandates the use of the Uniform BOL for all bills of lading: "All common carriers . . . by rail . . . are *required* to use straight bills of lading as prescribed in Appendix A and B to this part[.]" 49 C.F.R. § 1035.1(a) (emphasis added). Thus, the terms of the Uniform BOL are mandatory. Furthermore, and as noted above, Congress explicitly provided parties a means to escape the requirements of the Uniform BOL—by contracting under the authority of § 10709—which requires the specific and clear intent of the parties. *See* ECF No. 54 at 43:20-25; *Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 185 (S.D.N.Y. 2014) (defendant failed to "establish the intent of parties to enter a § 10709 contract" where there was no "explicit representation that [it] was a § 10709 contract"). Section 10709 would be rendered superfluous if, as the Estate Representative contends, parties could sidestep the Uniform BOL's requirements simply by negotiating their own bill of lading.

Furthermore, the plain language and purpose of the regulation make it clear that the terms of the Uniform BOL apply to MMA as a connecting carrier, regardless of whether MMA was a party to the BOL executed by the Shipper and CP. The regulation plainly requires that common carriers subject to the regulation "use straight bills of lading as prescribed in Appendix A and B." 49 C.F.R. § 1035.1(a) (emphasis added). The Uniform BOL was promulgated "in the interest of uniformity," *Ill. Steel Co. v. Baltimore & O.R. Co.*, 320 U.S. 508, 510 (1944), and was "intended to establish 'clear, easily enforceable rules for liability.'" *CSX Transp., Inc. v. Meserole St. Recycling*, 618 F. Supp. 2d 753, 768 (W.D. Mich. 2009) (*quoting CSX*

*v. Novolog Bucks Co.*, 502 F.3d 247, 257 (3d Cir. 2007)).  It follows that the provisions contained in the Uniform BOL—including the right to indemnification—apply to every carrier, regardless of where in the chain of transportation the carrier's services fall.  MMA thus enjoyed the benefit of the Uniform BOL's indemnification protection as a common carrier.

Accordingly, MMA possessed regulatory indemnification claims against the Shipper for damages arising from the mislabeling of the crude oil because of the automatic application of federal regulations to the BOL.  The Bankruptcy Court erred as a matter of law by concluding otherwise.

### 2.  Train 282's Bill of Lading

Wheeling further argues that MMA had regulatory and contractual claims arising from Train 282's BOL:  regulatory rights because the BOL incorporated the Uniform BOL by reference, and contractual rights through CP's tariffs, terms, and conditions.  The Estate Representative disputes that a connecting carrier such as MMA is a party to a bill of lading between a shipper and an originating carrier.  The Bankruptcy Court agreed, finding that a connecting carrier is merely an agent of the originating carrier and is not, therefore, entitled to the benefits and obligations of the bill of lading.

Each party marshals a string of court decisions, some of which are a century old, in support of its position, and they strongly contest the meaning of several seminal cases.  These decisions appear to be in conflict and require discussion.

The Estate Representative points to *Missouri, Kansas & Texas Railway Co. of Texas v. Ward*, 244 U.S. 383 (1917) as the foundational case in determining the

contractual rights of a connecting carrier. In *Ward*, the Supreme Court held that connecting carriers are mere agents of the originating carrier without contract rights:

> For the purpose of [f]ixing the liability, the several carriers must be treated, not as independent contracting parties, but as one system, and the *connecting lines become in effect mere agents*, whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carrier.

244 U.S. at 387-88 (emphasis added by the Estate Representative, *see* ECF No. 34 at 45). This holding, the Estate Representative claims, gave rise to the now-hornbook law that a connecting carrier is bound due to the agency relationship with the originating carrier, and not because it has a contractual relationship with the shipper. *See* 13 Am. Jur. 2d *Carriers* § 647 (2d ed. 2019) ("The law . . . treats connecting carriers as the agents of the originating carrier[.]"); 22 Williston on Contracts § 59:8 (4th ed.) ("Under the Carmack Amendment, because the shipper's actual or constructive contract, as embodied in or symbolized by the initial carrier's bill of lading to the shipper, is the sole agreement governing the duration of the carriage and is between the shipper and only the initial carrier, . . . subsequent carriers [are] mere agents[.]"). If MMA was merely an agent of CP, the originating carrier, MMA would not be a party to the BOL and therefore could not avail itself of any rights under that contract.

Wheeling, meanwhile, relies on the Supreme Court's decision in *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336 (1982), for the contrary proposition: that "a bill of lading is a contract that binds the shipper and all of the carriers involved in the shipment—not just the originating carrier." ECF No. 31 at 36. In *Commercial Metals*, the Supreme Court explained: "The bill of lading is the

basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." 456 U.S. at 342.

Wheeling also cites to *Texas & P. Ry. Co. v. Leatherwood*, 250 U.S. 478 (1919) for the same proposition. There, the Supreme Court explained:

> The bill of lading given by the initial carrier embodies the contract for transportation from point of origin to destination; and its terms in respect to conditions of liability are binding upon the shipper and upon all connecting carriers, just as a rate properly filed by the initial carrier is binding upon them.

*Leatherwood*, 250 U.S. at 481.

As between *Ward* and *Commercial Metals*, the latter most resembles the circumstances of this case: a carrier bringing claims against a shipper. In *Commercial Metals*, a connecting carrier (Southern Pacific) sued the shipper/consignor (Commercial Metals) to pay the balance of unpaid freight charges that the consignee had not paid upon delivery. *Commercial Metals*, 456 U.S. at 337-41. The shipments were transported under the uniform straight bill of lading and were transported by the originating carrier and two connecting carriers. *Id.* at 338 & n.1. The question before the Court was whether the shipper could assert a defense against the carrier's claims. *Id.* at 344.

The Court concluded that the bill of lading "[c]learly" constituted a contract upon which Southern Pacific could sue, even though Southern Pacific was not the originating carrier, referring to the bill of lading as "the contract between Metals as consignor and [Southern Pacific] as the carrier[.]" *Id.* at 343. Analyzing the "specific and clear" terms of the bill of lading, the Court concluded that Southern Pacific had established a "prima facie case of Metals' liability." *Id.* at 344, 352. As Wheeling

contends, the outcome reached in *Commercial Metals* would not be possible under the agency theory the Estate Representative derives from *Ward*.

The key to resolving the tension between *Ward* and *Commercial Metals* (and their respective progeny) is the nature of the underlying liability: Whether the shipper is seeking damages from a carrier, or a carrier is seeking damages from the shipper. In *Commercial Metals*, a carrier sued the shipper. 456 U.S. at 337-41. In contrast, in *Ward*, the shipper sued multiple carriers that had transported its cattle, which became crippled and debilitated during the journey. 244 U.S. at 384-85. There were multiple bills of lading between the shipper and the carriers, and so the central issue was whether liability would be determined by the bill of lading issued by the originating carrier, or by the bill of lading issued by whichever carrier was in possession of the cattle when the damage occurred. *See id.* at 387. The agency theory the Estate Representative derives from *Ward* arises from this specific context and it is distinct from the circumstances in *Commercial Metal*. This distinction is evident from the central holding of *Ward* itself: "For the purpose of *[f]ixing the liability*, the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents[.]" *Id.* at 387-88 (emphasis added). The phrase "fixing the liability" refers specifically to the determination of which connecting carrier or carriers are liable to the shipper for damages occurring during shipment. As the Supreme Court explained, treating the various carriers as agents in this context furthered the purpose of the Carmack Amendment, "which was to relieve shippers of the difficult, and often impossible, task of determining on which of the several connecting lines the damage occurred." *Id.* at

387.  The agency theory advances no such interest when it is the shipper that is alleged to be liable to a carrier because the identity of the shipper of the transported goods is clear.

The distinction between cases involving the liability of carriers and those involving the liability of shippers also helps to situate the Supreme Court's more recent ruling in *Northfolk So. Ry. Co. v. Kirby*, 543 U.S. 14 (2004), a case which the Estate Representative asserts is consistent with the agency theory from *Ward*, but which Wheeling argues is inapposite.  In *Kirby*, the shipper (Kirby) hired an intermediary (ICC) to arrange the transportation of machinery from Australia to Alabama.  543 U.S. at 18-19.  ICC, in turn, hired an ocean carrier (Hamburg Süd) to perform the through-carriage, and Hamburg Süd hired a rail carrier (Norfolk Southern) to complete the overland portion.  *Id.* at 21.  There were two overlapping through bills of lading, one issued by ICC directly to Kirby and another issued by Hamburg Süd to ICC.  *Id.* at 19, 21.  During the trip, the train derailed, and Kirby sued Norfolk Southern for breach of contract and negligence.  *Id.* at 21.  The central question in *Kirby* was whether Norfolk Southern could invoke the liability limitations in either bill of lading, or whether it was subject to the default full liability for rail carriers under the Carmack Amendment.  *Id.* at 22, 30.  In finding that Norfolk Southern could assert the liability limitations as a defense, the Court  treated "ICC as Kirby's agent for a *single, limited* purpose: when ICC contracts with subsequent carriers for limitations on liability."  *Id.* at 34 (emphasis in original).

The Estate Representative contends that *Kirby's* holding would be superfluous if all downstream carriers had full contract rights in a bill of lading just by their very

existence along the route, *see* ECF No. 34 at 50.  *Kirby* addressed circumstances not present in this case—a carrier seeking to limit its liability to a shipper through a bill of lading that the shipper was not a party to.  As the Court made clear in *Ward*, limitations of carrier liability implicate important policy concerns underpinning the Carmack Amendment.  *See* 244 U.S. at 387.  Those concerns are not implicated here where, as in *Commercial Metals*, the focus is on a shipper's liability to a carrier. Furthermore, *Kirby* involved multiple bills of lading, including one to which the shipper was not a party.  It was this issue that required the Court's invocation of agency principles to "ensure the reliability of downstream contracts for liability limitations." *Kirby*, 543 U.S. at 33-34.

The only case the Estate Representative cites where the agency theory is applied to an action by a carrier against a shipper is *Pa. R. Co. v. Gibson*, 23 F. Supp. 857 (E.D.S.C. 1938).  There, the court rejected the carrier's argument that *Ward* did not apply to an action by a carrier against a shipper and concluded that a connecting carrier is an agent who has no contractual right to sue the shipper.  Reasoning that the connecting carrier, as "the agent of the initial carrier," had no contract with the shipper, the court held that "[i]t cannot sue for services performed, because it performed services for the initial carrier alone." *Id.* at 859.  However, *Gibson* is an eighty-year-old district court decision from another circuit, and it has never been cited in a published decision.  I therefore view the decision as an outlier and give it no weight.[5]

---

[5]  The remaining cases cited by the Estate Representative all involved suits by shippers against carriers and thus, like *Ward*, are distinguishable from this case. *See, e.g., Strachman v. Palmer*, 177 F.2d 427 (1st Cir. 1949). For example, the Estate Representative cites *CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339 (6th Cir. *(continued next page)*

I conclude that the Supreme Court's decision in *Commercial Metals* is the controlling authority where, as in this case, a connecting carrier seeks to enforce provisions of a through bill of lading against the shipper. Thus, because MMA possessed indemnification claims against the Shipper under the BOL, and these claims constituted Wheeling's collateral, the Bankruptcy Court erred in concluding otherwise.

## B. The Value of Wheeling's Collateral

The Bankruptcy Court also determined that even if Wheeling did have collateral, it failed to prove that the collateral had any value. Wheeling does not dispute that it had that burden, but argues that the Bankruptcy Court erred by assessing value under state law (Maine's Uniform Commercial Code, the "UCC") and by requiring the identification, tracing, and valuation of "proceeds" of collateral as that term is defined in the UCC. These principles, in effect, required Wheeling to identify the specific portion of the $110,000,000 Comprehensive Settlement fund that was secured by the release of its collateral. Instead, Wheeling contends, this is an issue of "adequate protection" under 11 U.S.C.A. § 363(e) (West 2019), pursuant to which the Estate Representative must pay an amount equal to the value of the collateral it used without reference to identification, tracing, or proceeds. The Estate

---

2014), for the principle that "the shipper's contract (actual or constructive), as embodied in or symbolized by the initial carrier's bill of lading to the shipper, is the sole agreement governing the duration of the carriage and is between the shipper and only the initial carrier, making subsequent carriers mere agents of the initial carrier[.]" *Id.* at 355 (citing *Ward*, 244 U.S. at 387). *Hyundai*, like *Ward* and *Kirby*, is a suit by a shipper against a carrier. *Id.* at 342-43. Thus, its application of agency principles likewise relates to the limitation of carrier liability, which is inapplicable here. Furthermore, *Hyundai* also held that a connecting rail carrier "qualifies as an intended beneficiary [and] may enforce contract terms in its favor" on that basis. *Id.* at 372.

Representative disputes that this case implicates the requirement of "adequate protection" under § 363(e).

The "adequate protection" requirement in § 363(e) provides, in relevant part, that:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C.A. § 363(e). Both parties agree, however, that 11 U.S.C.A. § 506(a)(1) provides the rules for determining the value of Wheeling's collateral. *See* ECF No. 34 at 29; ECF No. 35 at 24. That section provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

§ 506(a)(1). Section 506(a)(1), however, still begs the question of how the value of Wheeling's collateral should be determined. While acknowledging the greater difficulty of valuing non-tangible assets like legal claims, Wheeling argues that "the *prima facie* measurement of the value of a cause of action is the damages, net of costs of prosecution of the cause of action, that could likely be recovered." ECF No. 35 at 25. As such, Wheeling views the parties' stipulation as sufficient to prove that the

prima facie value of its collateral was no less than $10,000,000. ECF No. 31 at 24-25.

The parties' stipulation stated that it established the amount of MMA's "net economic damages" associated with the contract claims, and not the value of the contract claims themselves or, for that matter, any statutory or regulatory claims. *Id.* Wheeling incorrectly treats these two measures—"net economic damages" and "value"—as the same. But a net economic damages standard fails to account for several factors—such as the existence of counterclaims or contributory negligence and the uncertainty of litigation—that would likely diminish the actual value of MMA's claims. The cases that Wheeling cites in support of its argument that these factors should be ignored and that net economic damages is the proper measure are inapposite. Two of the decisions pertain to the sufficiency of damages allegations for legal malpractice claims and are not closely analogous to these circumstances. *See Barry v. Liddle, O'Connor, Finkelstein & Robinson*, 98 F.3d 36, 40 (2d Cir. 1996); *Levy v. Spinney*, No. 93-CV-0761, 1994 WL 477228, at *3 (N.D.N.Y. Aug. 30, 1994). Wheeling also cites two cases where "litigation value"—the amount of a claim—rather than its "settlement value," was used as the measure of damages for the purpose of determining the "amount in controversy" requirement for federal diversity jurisdiction. *See Finley v. George Weston Bakeries Distribution, Inc.*, 473 F. Supp. 2d 105, 106 (D. Me. 2007); *Doughty v. Hyster New England, Inc.*, 344 F. Supp. 2d 217, 219 (D. Me. 2004). The issue here, however, is not a threshold question of entry into federal court, but rather a question of the amount of money Wheeling can recover.

The Bankruptcy Court correctly determined that Wheeling had failed to meet its burden to prove the value of its collateral.  The Estate Representative testified that the aggregate value of all claims for damages against the Shipper was at least 2.5 billion dollars, ECF No. 5 at 267, and that all of those claims were settled for only 110 million dollars, or 4.4% of the total aggregate value, as part of the Comprehensive Settlement.  ECF No. 31 at 26; ECF No. 34 at 36 n.14.  Wheeling presented no evidence that calls into question the reasonableness of this precipitous settlement discount and its impact on the value of MMA's claims.  In addition, the Estate Representative testified that MMA was likely contributorily negligent and, as such, could be found fully liable under the provisions of the Carmack Amendment.  ECF No. 5 at 241-42.  "[U]nder [the Carmack Amendment] . . . the shipper establishes [its] prima facie case [against a carrier] when [it] shows delivery in good condition, arrival in damaged condition, and the amount of damages."  *Mo. Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964).  The burden of proof then shifts to the carrier to "show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability."  *Id.*

Thus, there is factual support in the record for the Bankruptcy Court's finding that Wheeling's collateral—MMA's indemnification claims against the Shipper—had no value.[6]  Further, as I determined in my previous order denying Wheeling injunctive relief, the Estate Representative's testimony on this point was properly

---

[6]  Because I conclude that the Bankruptcy Court did not err in finding that Wheeling failed to show that its collateral had any value, I need not consider whether Wheeling can "trace" or identify what specific slice of the settlement fund is attributable to the release of Wheeling's collateral.  It is also unnecessary to determine whether the parties' stipulation makes out a prima facie valuation of the collateral.  Even if it did, the Bankruptcy Court was not obligated to accept that prima facie value considering the countervailing evidence presented by the Estate Representative, which went unrebutted.

received as fact testimony. *Wheeling & Lake Erie Ry. Co. v. Keach for Montreal Me. & Atl. Ry., Ltd.*, No. 1:18-cv-00262-JDL, 2018 WL 4696457, at *3 (D. Me. Oct. 1, 2018). The evidence was therefore appropriately considered by the Bankruptcy Court in arriving at its factual determination.

In evaluating the Bankruptcy Court's ruling on this issue, I am mindful that I am acting in an appellate capacity and not as a factfinder. The Bankruptcy Court's findings of fact are, of course, given deference. In reviewing an appeal, courts give "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir. 1997). Giving the appropriate deference to the Bankruptcy Court's factual findings, I conclude that it properly determined that Wheeling had failed to prove that its collateral had value.

## IV.  CONCLUSION

For the foregoing reasons, Wheeling's appeal (ECF No. 1) is **DENIED** and the judgment of the Bankruptcy Court is **AFFIRMED**. As the preceding analysis demonstrates, Wheeling's appeal was substantive and not frivolous. Accordingly, the Estate Representative's Motion for Damages and Costs (ECF No. 42) is **DENIED**.

**SO ORDERED.**

**Dated this 18th day of June, 2019.**

**_____/s/ JON D. LEVY_____**
**CHIEF U.S. DISTRICT JUDGE**